Case number 13-6370, William Sours, administrator of the estate of James Sours, deceased, v. Big Sandy Regional Jail Authority and others, arguments not to exceed 15 minutes per side. Mr. Belsley for the appellant. Would you pause for just one moment? Sure. Judge Cook, can you hear? Yes. Thank you very much, Judge Stransche. I hear very well. Please proceed. May it please the court, ladies and gentlemen, Mr. Mando, my name is Greg Belsley. I'm here this morning on behalf of the estate of James Sours who died in the Big Sandy Regional Detention Center. I have asked to reserve two minutes for rebuttal in this case and in this argument. The district court below erred in two ways in dismissing all of the plaintiff's claims save one, which for reasons described in our brief, we considered to be our weakest. First, the district court, from its opinion, appeared to believe that what the plaintiff had to show was that the defendants needed to know that he was experiencing the risk of diabetic ketoacidosis in particular as opposed to simply recognizing that he had a serious medical need that mandated treatment and then did nothing. The other error that the judge committed was disregarding the Sixth Circuit's admonition in the Phillips v. Roane County case and the case of the state of Carter v. City of Detroit. In Phillips v. Roane County, the Sixth Circuit expressly recognized that, and I quote, officials, of course, do not readily admit the subjective component of the deliberate indifference test and therefore it's permissible for the reviewing court to infer from circumstantial evidence that a prison official had the requisite knowledge. The court got even more particular in the state of Carter. It said, in fact, in most cases in which the defendant is alleged to have failed to provide treatment, there is no testimony about what inference the defendant in fact drew. In those cases, a genuine issue of material fact as to deliberate indifference can be Two points with regard to that last authority. First of all, there's no dispute in this case that we've met the objective component. The defendants have conceded Mr. Sowers was a diabetic, that he had a serious medical need, so all we're arguing about here this morning is whether the evidence adduced in this case to go to a jury on the issue of the subjective component, and here I want to emphasize to the court that this is a wrongful death case. Mr. Sowers was in isolation during the key part up to the time of his death, from the time of his incarceration. He died. Unlike the cases that I've cited to the court, the Garretson case, the Lawley case, the Natale case, I have no plaintiff to come into deposition or to come to the court to say, I told them this. What they say was not true. I was asking for help. In this case, my proof on the subjective element was dependent upon what the document showed and what I could get the defendants to admit in their depositions. And that varies, doesn't it? It does. So you would need to address the objective knowledge component and what subjectively might be drawn from that on a defendant-by-defendant basis. That's correct, Your Honor. And if you please let me do that from the foundation that the Sixth Circuit established in the Garretson case and do it by way of comparison with Garretson. In Garretson, you had a situation where an individual came into the jail, said, I'm insulin dependent and I'm past due for a dose of insulin. That's it. There was no evidence that Al Tabeli, the identified officer in Garretson, or the unnamed officer that took Garretson to her cell, observed any symptoms of distress. In this case, in Mr. Sauer's case, when he came into the jail on Tuesday, July, and let him go to jail on Tuesday, July 13th, he met with Nurse Allison and he told her he was diabetic, he took insulin, he said he couldn't take care of himself. What of that information did she convey to the deputy jailers? There is no information, there's really no evidence of what she told the deputy jailers. The deputy jailers, after Nurse Allison left the jail the next day for four days, the deputy jailers all testified that they were under the assumption Mr. Sauer was a diabetic because they were asked to take his blood sugar. So they knew that much, they knew that much. But just speaking in particular of Ms. Allison, he told her, I'm diabetic, I take insulin, I can't take care of myself, which means, which I think a medical, competent medical professional would interpret to mean, I don't know how much insulin I need, when, or how often. Excuse me. I'm sorry. Judge Cook, I'm sorry, go ahead. Oh, I wanted to clarify on this point that your client told, I mean, is there any dispute that he told Nurse Allison that he was a diabetic but he hadn't had any insulin in approximately a month? I have no evidence to dispute that, Your Honor. Okay, and do you not, I think your response brief acknowledges that that is fairly significant in terms of the urgency. He didn't bring any with him, he said he can't take care of himself, and he said he hasn't been seen in a long time and hadn't had any insulin in what we would think was a fair amount of time if you were seriously dependent on your insulin. That's, that's correct, Your Honor, however, there's no question but that given Mr. Sauer's presentation, he was not a reliable historian. The fact that he said that he took insulin, hadn't been taking it, certainly would raise in the mind of a medical professional whether he was past due for his insulin. Or it, apparently Nurse Allison questioned that this was more about his drug dependency and how he was currently, you know, having taken a fair amount of drugs. That's correct, Your Honor, but there's two points to that, and the first one is Nurse Allison did not have the training, the qualifications to distinguish between whether his symptoms evidenced detoxing or diabetic ketoacidosis. She was just an RN. Secondly, it was clear after, in the second day that Mr. Sauer's was at the jail that his condition began to deteriorate. His blood sugar level went up. It was already significantly high when he came in. He started, he was complaining of nausea and vomiting. He refused a blood test. One other factor... What do you make of the fact, in this case, that he refused to test his blood? Again, we couldn't ask Mr. Sauer's. I couldn't say in evaluating this case, why did you do that? I don't know, Your Honor, whether he had the competence and the presence of mind to be doing that in an effort to force his being transported to the hospital, or whether that evidenced confusion on his part. And frankly, just like distinguishing between detox and diabetic ketoacidosis, there was nobody at the jail that ever saw this man that could make that determination. He never saw a physician. He needed to be treated, period. He saw an RN. What is Hyland's? Her notes indicated, Allison's notes indicated that he was in Hyland's about a month ago for diabetes. Hospital. That's a hospital. Yes, Your Honor. Yes, Your Honor. The other thing was that Nurse Allison, in her deposition, admitted that if, in fact, what Mr. Sauer's was going through was evidencing primarily detox as opposed to diabetic ketoacidosis, she admitted she knew he had diabetes and that going through detox, compounded with his liver problems, could exacerbate his diabetic ketoacidosis. Now in so many, in the Garrison case, and as the court has recognized in these cases, the defendants are loathe to admit the inferences they drew, but with regard to Nurse Allison, we know the inference she drew. Before she left the jail on July 14, Wednesday, July 14, knowing that there was not going to be a medical professional in the jail until the following Monday, and without having informed Dr. Belhassen of what she had been seeing that day in terms of Mr. Sauer's condition, she told the jailer that Mr. Sauer's was a critical situation. So we've got testimony as to the inference she drew there. And when you put these facts together as to Nurse Allison, and you consider what she knew, the evidence indicating his deterioration, and the limitations upon her ability to make any conclusions as to what this gentleman was doing, the fact that she left the jail on Wednesday night, having not even ordered insulin for this man, which the court in, I believe it was in the Natale case, said in the Third Circuit, that's common sense. It's just, I think we've easily cleared the deliberate indifference bar with regard to Miss Allison. Let's stay down to some of the jailers where the evidence is a little bit different. What is your best evidence as to why Griffith should remain? Griffith said he wouldn't take the medicine that he was offering him. And his testimony was, had the nurse been here, had she been here and I just had to walk to her office, I would have told her. And my argument is, if he'd walked to her office and would have told her if she'd been there, he should have called her. That simple. Now the district court said that didn't make any difference because the medicine he was trying to give Mr. Sowers was not for his diabetes. That made no difference to Mr. Griffith. And it should, it's sort of a post facto rationalization for his conduct, shouldn't make any difference to this court. And what about Administrator Madden? Well, there's a variety of issues with regard to Administrator Madden. First of all, Your Honor, he was the one that Nurse Allison told, this man's a critical situation. Bye-bye. Was there an indication to him that that critical situation had to do with his health? I think it was clear, I believe it could be inferred from the testimony that it did. There was no other basis for that comment. I mean, she, yeah, clearly she knew it and if she failed to convey it, that's her problem, not his. Of course, he denies that she even said that to him. But that's a fact issue and if she said that. If that was an adequate piece of information to place him on notice that he should do something. I believe it was, Your Honor. Why? Because he's told, I've got an inmate in the jail, you've got an inmate in your jail, critical health situation, I'm leaving. He knows he's not going to have a nurse there or a physician there. He knows at that point it's up to him, it's on him and his guards. With regard to Madden individually, there's no evidence that he did anything about Mr. Madden's told that, nothing. And also, as the court can see, we've made the failure to train argument in our brief. I believe your time's up. It is. You're rebuttaled. Thank you. May it please the court, Mr. Belsley, Jeff Mando on behalf of the Big Sandy Regional Detention Center, deputies and Nancy Allison. The district court in this particular case took an extensive review of all of the deposition testimony, all the documentary evidence in this case. Did he take it in the light most favorable to this point? I believe he did and he set forth that standard in his order, Your Honor. He looked at the evidence in this case, which I think the material facts are undisputed. What we're arguing is about is what is the implication of these material facts in this particular case. Why was he arrested and in Big Sandy to begin with? Was either a probation violation or an alcohol or drug offense. It was a misdemeanor charge, I believe, Your Honor. We really didn't do a lot of discovery as to why he was brought in, but he was a pre-trial detainee. Correct. That's correct. But in this particular case, the district court, looking at all of this evidence and looking at the order, you can tell the district court took an exhaustive review of the particular pages of the deposition testimony and the specific content of the records and concluded that the plaintiff had failed to make out facts sufficient to establish the subjective component of the deliberate indifference test. Help me understand how that conclusion comes from the evidence as to Nurse Allison, who is told when the guy walks in the door, I'm a diabetic, I haven't been taking my medicine, but I was in the hospital for my diabetes a month ago, I get confused at times, and I can't remember if I've taken my insulin or not. And I don't have anybody to bring me my insulin bottles, and I'm not capable of caring for myself. Now, what would that convey to a health professional? It would convey to a health care professional exactly the facts that he conveyed, that he was a diabetic, that he had not had treatment in some time, that he had not taken insulin in some time. But it had been serious enough to be in the hospital for it within the month. Or he could have gone to the hospital or an emergency room for treatment, which people do, you don't know. What's key here, I think... But she doesn't get... When you're taking the evidence in the light most favorable to the plaintiff, the defendant doesn't get to put a gloss on that evidence. The question is whether a health care professional receiving that information is on notice that there's a serious risk. They admit that objectively they were on notice. So how is it a trained professional who understands diabetes doesn't also subjectively apprehend the serious danger? Where it comes from is, yes, we agree, diabetes in this condition met the objective component. But what she did here is key. What she did. She drew the inference that he was detoxing, that his diabetic condition was not that serious because he had been maintaining for some period of time, and she communicated that. If he has 327 as his sugar number, how is that not in itself an indication that he's in trouble on insulin? That varies from individual to individual. Again, this man had been maintaining and going without insulin for some period of time. People that are diabetics can't go without insulin. I'm just struggling with that as a conclusion because what he said to her was, I am not sure when and if I have taken my insulin. That's in her notes. She testified consistent with those notes that he had not taken insulin in over a month. That's what he told her when she interviewed him at length about her condition. She then took her note and she faxed it. The part of deliberate indifference is, when I try and put this in lay terms, it's I knew of something and I didn't give a damn. That to me is what deliberate indifference means. Nancy Allison didn't do that. I guess I would beg to differ a little because indifference doesn't necessarily say I'm intending for this harm and I don't care. It says there is a serious and unreasonable risk and I'm not doing anything about it. Correct. That's the same as I know of it and I'm not going to do anything about it. Nancy Allison in this case did do things about it. She took her note and she sent it to Dr. Belhazen. Dr. Belhazen never ordered insulin for James Sowers. Never said get him on insulin and you need a prescription for insulin in order for Nancy as a nurse to administer it. Nancy Allison, after she saw him, followed up the next day. She saw him four times in the course of 24 hours. She persuaded him to take the blood sugar test. She interviewed him and talked to him and he says I'm not here about my blood sugar. That's what she testified to. He was talking about wanting to go home. He claimed to her about chest pains a little bit, about some vomiting, which again within the prison setting is a common sign of someone who is under the influence of alcohol maybe going through what a standard detox. And also a very common sign of dangerous levels of sugar in the blood? Could be, but she inferred. But isn't that the key? No, I don't believe it is the key. For a health care professional to recognize the symptoms of impending diabetic death. She should know, as a medical professional, she should know some of the key components of diabetes and what the risk factors are. And she testified that she was aware of diabetic ketoacidosis. She knew what the symptoms were that would commonly exhibit such as extreme fatigue, headache, vomiting, frequent urination, extreme hunger or thirst. He never had those symptoms and she testified she never observed those symptoms. And she testified that James Sowers was never asking for insulin and said he wasn't having problems with his sugar. He said he had some chest pains. He said he was vomiting. He had some nausea. He wanted to go home. So he has some symptoms of diabetic problems. And is your position she just committed malpractice? I'm not saying she committed any malpractice. I'm saying that on the state law claims, malpractice versus constitutional violations are two different things. And in this particular case, and the Sixth Circuit has said it, is we have to be careful that we don't take state law tort claims and constitutionalize them and make them civil rights violations. And that's what I think the plaintiff wants to do in this case. What exactly did he say to her that allayed her concern about diabetes? He made exactly what statements to her. You're relying on that relatively, you're relying on that a lot. Right. Exactly what were those statements? He specifically told, he never specifically asked for insulin. He specifically told her that his problems he was experiencing were not with his blood sugars. He said that he was having a little bit of chest pain when she saw him on July 14th at 545. He said he wasn't feeling well and vomiting. He was a little nauseous. He said, he specifically said to her, blood sugar was not the problem. He wanted to go home. He denied, he specifically denied to Nancy Allison when she saw him on July 14th at 535 p.m., he specifically denied any weakness, extreme lethargy, disorientation, headaches, extreme hunger or thirst, or frequent urination, which are the common recognized signs for someone who might be at risk for diabetic ketoacidosis. Again, she saw this man four times. She talked with him, tried to communicate with him, placed him in a medical observation cell, put him on the standing orders which were there for a low-carb diet, asked the deputies to try and get blood sugar tests. Mr. Sowers, of course, was refusing those. When he refused them, one day the deputies brought him to her and she was able to convince him to do the blood sugar test. At that time she said, yeah, it's a little high, but I really still thought it was part of the detox process, which is common for inmates when they're brought into a prison setting within the first 24 to 48 hours. It's consistent with what Tony Allen said when he saw Mr. Sowers. Tony Allen was the deputy who started at midnight and went through 8 a.m. on July 15th. Nancy Allison sees him four times in 24 hours, leaves about 9 or 10 o'clock, watches him in the medical observation cell before she leaves, tells the deputies that she's got a note from Dr. Belhazen to take him to the hospital the next day or Friday in order to draw blood, and he's going to see Dr. Belhazen on Monday. I think it's significant that Dr. Belhazen, the jail physician, never said get this man to the hospital to Nancy Allison, never said get him on insulin, here's a prescription, never said that. Her testimony was that she had left the sliding scale information there and expected the nurse to comply with what she indicated was the procedure, is to follow the sliding scale administration. Nancy Allison indicated that she did not have a prescription for insulin for Mr. Sowers, and that's why she could not administer insulin to him. She had to have a prescription for him. Did she ask the doctor? No, she did not ask the doctor. She faxed the note to Dr. Belhazen, Dr. Belhazen sent back the next day instructions to get some blood work done on this man and put him on the list, I'll see him on Monday when I'm there. And that's the communication between Dr. Belhazen and Nancy Allison. Nancy, yeah. You're sort of arguing that they can't meet the deliberate indifference standard because they did a lot of work at the jail to try to find out what was wrong with the guy instead of sort of leaving him alone, and they just made a mistake there, I guess. Correct. It wasn't quite what they diagnosed, but it was a, you're basically saying here your defense is it was an erroneous diagnosis, but it was not prompted by an indifference to his welfare. Correct, and that's what, Your Honor, that's what makes this case markedly different from the Gerritsen case. In Gerritsen, the plaintiff in that case came in and said specifically, I'm insulin dependent, I am late for my insulin shot. And the deputy in that case denied her the insulin. She then asked for I'm just struggling with that comparison because here we've got a guy who comes in and says, I was in the hospital about a month ago for my diabetes. I don't think I, and then there's questionable language, I've not been taking my medicine. And then I get confused at times, and this is from her notes, and is not sure when and if he has taken insulin, says he is not capable of caring for himself. What would she, as a health care professional, in light of that admission or that statement about his ability to say what he needs or what he's even taken, and in light of her knowledge of what the symptoms are for diabetic problems, is your statement that she just, I'm just really, I'm struggling to understand this. I understand. And what she did was, is she got that information just as you said, and we have to construe that in the enlightenment's favor to the plaintiff. We acknowledge that. But she took that information and sent it to Dr. Belhazen, the jail physician, who's the one who has to make the call on what prescriptions have to be administered in this particular situation. Dr. Belhazen never said, get this man to the hospital. Dr. Belhazen never read that note and said, get him on insulin right away. Instead, Dr. Belhazen, the other thing she did, is she put him on close observation, waiting instructions from Dr. Belhazen. That was her testimony. That's what she indicated she did. She also said, get regular blood sugars. She got instructions from the doctor, didn't she? Get his blood tested, and I'm going to look at him when I get in. And then Nurse Allison leaves him alone, no health care professional in the facility for four days. She leaves him, she leaves at sometimes 9, 10 o'clock on the 14th. She leaves instructions for the deputies in terms of take him to the hospital, get the blood sugar work done, blood work done today or tomorrow. He's on the list to see the doctor. Keep an eye on him. The deputies also know that there's a medical emergency. She's on call 24-7. That was the testimony. So if they ran into a medical emergency, they can call her in order to find out what they should do. Or if they recognize... Did they call her when they walked in and he was unresponsive, effectively unconscious on the floor of the jail? No. They exercised the other option because at that point, when the deputies came in at 1045 or so on the evening of the 15th, at that point, Sowers saw him and said he was breathing, he was awake, but he was unresponsive. He immediately calls the supervisors. Blanton and Montgomery immediately come into the cell. In contrast to the cases cited by Mr. Belsley, the Owensby, and Jackson in these cases where they ignored the man, the people were on the ground bleeding and they just ignored him, that's not what happened here. Montgomery immediately went to Mr. Sowers, tried to rise him, tried to assess the situation, tried to see if he could get him to respond, touched him to see what was going on here, and then within a matter of minutes, made the decision to call an ambulance to take care of him. So the deputies in these particular situations, if there's not somebody on staff, if there's not somebody on site, they can call the jail nurse, in this case, which they're on call 24-7 for calls, or they did the other option. They called an ambulance. I guess you've got a guy on the floor who's unresponsive, effectively unconscious. 10-40 he finds him. He's awake, he's not unconscious. His eyes are open and he is unresponsive is what the notes say. And he was breathing, according to the testimony. He was breathing at that time. Seven minutes before the other people come, it's 10-52, which is we're at 12 minutes before they call an ambulance. The hospital's five minutes down the road. It's 11-06 before the paramedics arrive, and he's not breathing. By 11-37, he's dead. Explain to me why there was appropriate action under those circumstances. There was appropriate action under those circumstances because you've got deputies doing the best they can, and they're making judgment calls. These are deputies. They're not trained nurses. They're not medical professionals, and I don't think the Constitution requires that they be. But instead, they came in. Again, they were checking on him. The evidence is they were checking on him throughout the night. And when Salyers found him at 10-40, his eyes were open, he was breathing, he was unresponsive, he immediately calls his supervisors. It takes them five or six minutes, according to the time records, to get into that cell from where they were. I think the testimony was Blanton was in the bathroom when the call came out. They get there. Within six minutes, according to the record, they make the decision to call the ambulance. And again, they went through a process of deciding, do we call the ambulance where the EMTs come and assess him and get him to the hospital, or do we try and get a guy who's unresponsive, do we try and get him onto a cart, onto a cot, into a cruiser, and transport him ourselves? They made the judgment call that it was better in that case to get the EMTs there. Now, they couldn't help the fact that it took the EMTs longer than normal to respond. That's something they can't control. And again, it's critical and distinguishes our case from these other cases. Like 15 minutes, I think. I'm close. I might be off, but it's close. Five minutes away. They expected a quicker response, but again, that was out of their control. And it's a situation where, again, if you look at what the testimony was, they were looking at Mr. Sowers. When Montgomery got in that cell, he got down, and he knelt down, he touched him, he tried to talk to him. That's stark contrast from these delay cases like Owensby and Sarkozy. I believe your time is up. Thank you, Your Honor. You have your rebuttal. Thank you, Your Honors. Judge Merritt, you asked whether the defendant's position was whether they made a diagnosis and got it wrong. And they said that's exactly right. The problem was there was nobody in that jail that was qualified to make that diagnosis, and they knew it. Ms. Allison was an RN. She couldn't make that diagnosis. The guards weren't qualified to make that diagnosis. Why would every jail there be a doctor who specializes in insulin and diabetes? I mean, we are a wealthy country, but we're not wealthy enough to have a specialist on different subjects in the jails of America. So somebody has to try to figure out when someone is arrested and brought in what the problem is if there is one. And it looks like to me that they made a substantial effort to understand. I mean, there was a lot of effort to try to figure out what was wrong with this guy. So the question then is, is the erroneous diagnosis itself deliberate indifference if they don't have somebody there who's an expert and who could have figured out in advance what the problem was? I think it is, Your Honor, and I agree with all your points, but I think it is in this case when there's no one there that has the qualifications to figure out what's going on, and when there is a doctor, a phone call away, and there's a hospital four minutes down the road. He apparently conveyed to the nurse that it wasn't his diabetes that was the problem. Your Honor? Didn't he? I don't know because Mr. Sowers didn't make it. He can't tell us what he said. He can't say, no, I didn't say that to the nurse. So there's an absence of evidence from him, but that's what the nurse, the reports were for the district judge to assess. Well, Judge, that's what she said, but that's why I think summary judgment in this case is particularly inappropriate. First of all, given the evidence that we've induced in discovery, and second of all, a jury needs to see these people on the witness stand and make that credibility assessment. When all I've got to go on is their documents and their admissions in discovery under these types of circumstances, I think there's plenty of argument for the fact that a jury has the right to see these people and decide and assess their credibility, determine whether they're telling the truth. Thank you. Thank you, Your Honor. We will take the case under advisement. Thank you for your arguments, counselors. You may call the next...